UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JENNIFER MAY,<br><br>    Defendant. | Case No. 25-CR-211 (CRC) |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

In late 2021, Defendant Jennifer May successfully applied for $1.5 million in COVID-19 relief aid on behalf of her small business, Next Level Partners LLC ("NLP"), not because the firm needed those funds – it did not - but because she wished to use that money earmarked for struggling businesses to speculate in a thinly traded cryptocurrency she was hopeful would take off. When her speculation failed and she sustained losses of hundreds of thousands of dollars, she re-directed the pandemic relief funds not to the actual business for which she applied, but to separate, unrelated businesses. When that was unsuccessful as well, the Defendant admitted to the Small Business Administration ("SBA"), the government agency responsible for administering the COVID-19 relief loan she obtained, that she was simply unable to pay nearly the entirety of the loan back. Despite the complexities of aspects of the defendant's scheme, at its core what she did was simple: the Defendant fraudulently applied for funds that her business did not need and then proceeded to gamble with the public monies she received. For her conduct, the government is recommending a sentence of 21 months' incarceration followed by a term of three years of supervised release. The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits the following memorandum in support of its recommendation.

I. **PROCEDURAL BACKGROUND**

On July 29, 2025, the United States filed a single-count Information charging the defendant with Wire Fraud, in violation of 18 U.S.C. § 1343. *See* ECF No. 1. On August 27, 2025, the defendant was arraigned on the sole count of that informant and pled guilty before this Court pursuant to a written plea agreement with the United States. *See* ECF No.8. The Court set a sentencing date of December 9, 2025, and referred the matter to the U.S. Probation Office for the District of Columbia ("USPO") to complete a pre-sentence investigation report. USPO completed its final report and recommendation on December 1, 2025. *See* ECF Nos. 15-16.

II. **FACTUAL BACKGROUND**

In support of his plea of guilty, the Defendant agreed to and acknowledged the following factual proffer.

1. Jennifer May resided in Washington, D.C.

2. May was the sole owner of Next Level Partners, LLC ("NLP") a consulting firm based in Washington, D.C., which specialized in assisting congressional and presidential campaigns in complying with regulations promulgated by the Federal Election Commission and managing their accounts payable function for them.

3. May maintained several accounts, both personally and for NLP, at Bank of America.

4. May also maintained personal accounts at BlockFi and Coinbase, two cryptocurrency exchanges.

5. In response to the COVID-19 pandemic, the SBA offered certain entities, including small business owners, Economic Injury Disaster Loans ("EIDL"). These loans were provided directly from the SBA and were low-interest, fixed-rate, long-term loans. EIDL loan proceeds could be used for working capital to make regular payments for operating expenses, including payroll, rent/mortgage, utilities, and other ordinary business expenses, and to pay business debt.

6. Prior to the application at issue, May had previously applied for and received $499,000 in EIDL funds on behalf of NLP.

7. On October 21, 2021, May applied for a second modification to the original loan amount, asking for an additional $1,500,000 in funds for NLP. In doing so, May

8.     agreed to be bound by the terms of the Amended Loan Authorization and Agreement, under which she represented that she would "use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter…" for the entity on behalf of which she applied, NLP.

8. On November 8, 2021, with NLP's EIDL second modification application still pending, May sent an email to an SBA customer service representative in connection with this application asking "Is there anything I need to do.? I thought the loan would have been distributed by now. Please let me know. I need to make payroll."

9. Yet at the time of making these representations in her application to and subsequent communications with the SBA, May did not intend to use the second modification to her original EIDL application for working capital and payroll purposes. Rather, May initially sought to use these proceeds to speculate in cryptocurrencies she had been researching in the months and weeks leading up to her application, including one token in particular – Tomb, which is traded on the Fantom Blockchain. Moreover, by submitting the application and emailing the SBA representative, both of which contained her false representations, May caused interstate wire transmissions.

10. On November 24, 2021, the SBA disbursed $1,500,000 into NLP's Bank of America account controlled by May. On that same day, May transferred $775,000 from NLP's Bank of America Account and sent to it to her own personal checking account.

11. In addition, also on November 24, 2021, May transferred another $100,000 – broken up into four tranches of $25,000 – through four separate accounts she controlled, many of which had little to no activity prior to the transfers, to that same personal checking account mentioned *supra* at ¶ 10.

12. On that same day – November 24, 2021 – May transferred $75,000 in EIDL proceeds from her personal checking account and deposited it into her Coinbase account, after which, through a series of transactions involving different cryptocurrencies, she purchased a variety of tokens, including Tomb.

13. Also on November 24, 2021, May transferred $750,000 into her BlockFi account, through which, again, she conducted a series of cryptocurrency transactions to obtain Tomb on the Fantom blockchain.

14. May ultimately sustained losses of approximately $446,296.93 in her speculation on Tomb and other cryptocurrencies. In March 2022, May ultimately transferred out what remained of her EIDL funds in BlockFi, consisting of one tranche of $133,639.37 and another of $161,625.00, to a separate Bank of America account. She then used the remaining EIDL proceeds for the purpose of consummating a purchase of a restaurant / bar / childcare space known as The Lane at Ivy City in

   Northeast Washington, D.C. The Lane at Ivy City was wholly and completely operationally unrelated to NLP. Indeed, in and around this time, May communicated with another individual that she was using EIDL funds for NLP not for that business (NLP) as promised in her applications and modifications, but to fund this venture (The Lane).

15. Further, approximately $81,492.96 in additional EIDL funds which remained in her NLP Bank of America account were also transferred to an escrow account held by a Virginia-based title and settlement company to fund the purchase of an unrelated commercial real estate property in Middleburg, Virginia. The purpose of this purchase was for May and a business partner to find a location to house computer hardware that would facilitate the mining of cryptocurrency. This venture was completely operationally unrelated to NLP, the entity for which May had applied for EIDL funds in October 2021.

16. May did not repay the EIDL as required, and her EIDL became delinquent.

17. On January 17, 2023, SBA representatives began attempting to contact May regarding her delinquent EIDL. These attempts continued every few days, sometimes occurring multiple days in a row, until contact was finally made with May on April 5, 2023. May informed the representative that she completed a payment via the portal while on the phone with the representative, in the amount of $9,853, and would make another payment soon. When she asked about hardship deferment options, May was told that she could not be more than 60 days past due to qualify. Following this interaction, the loan continued in delinquency and SBA representatives attempted to contact May every few days. On November 6, 2023, a representative successfully reached May and May told the representative that she had no money to pay the EIDL.

18. Overall, within six days of the EIDL funds being disbursed into NLP's Bank of America account, approximately $1,194,200.00 was transferred out of it by May to other, unrelated accounts which she herself personally controlled. (Specifically, the beginning balance of NLP's Bank of America account on November 1, 2021 was $11,229.12 and, in addition to the EIDL funds, there were only $13,457.87 in additional funds deposited into that account during the month of November.)

19. The proceeds from May's scheme that she obtained have been dissipated by her and cannot be located upon the exercise of due diligence; have been transferred or sold to, or deposited with, a third party; and/or have been placed beyond the jurisdiction of the Court.

*See* ECF No. 9.

III.   DISCUSSION AND APPLICATION OF U.S. SENTENCING GUIDELINES AND 3553(a) FACTORS

    A.   <u>Generally Applicable Legal Principles</u>

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). See *United States v. Gall*, 128 S. Ct. 586, 596 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>>
>>> (i) issued by the Sentencing Commission ...; and
>>>
>>> (ii) that, . . . are in effect on the date the defendant is sentenced; ...
>
> (5) any pertinent policy statement –
>
>> (A) issued by the Sentencing Commission ... and

>> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

B.    <u>Guidelines Calculations</u>

Turning to 3553(a)(4)(A), for the reasons set forth in its response to the Pre-Sentence Investigation Report (hereinafter, "PSR"), the government agrees with the calculations of U.S. Probation regarding the defendant's Total Offense Level under the U.S. Sentencing Guidelines (hereinafter, "Guidelines"), with the exception of the two-level enhancement under USSG §2B1.1(b)(12), for the reasons it has already stated on the record in its November 14, 2025 letter to USPO. *See* ECF No. 14. The government also agrees with USPO's calculation of Ms. May's criminal history. As such, the government's calculations of the Defendant's sentencing range under the USSG differ only minimally from that of USPO's.

    1.    *Total Offense Level*

The Guideline for a violation of 18 U.S.C. § 1343 is § 2B1.1, which provides for a base offense level of 7 in cases such as this one in which the statutory maximum is at least 20 years' incarceration. *See* PSR at ¶ 6. In addition, because the amount which the Defendant misappropriated is $1,490,147, the loss amount is between $550,000, but less than $1.5 million, which results in a 14-level increase to the base offense level. *See id.* at ¶ 7. As noted above, the United States disagrees with the application of the specific offense characteristic involving 18 U.S.C. § 1040 and stands by the arguments made in ECF No. 14.[1] That leaves an adjusted offense

---

[1] In response to the USPO's December 1, 2025 Addendum, the government would note that in *U.S. v. Chen*, 24-cr-50, the United States did not ultimately seek to apply the enhancement at issue in this case.

level of 21. Because the defendant meets the criteria set forth in §4C1.1 for a "Zero-Point Offender," her offense level is reduced by two levels. *Id.* at ¶ 45. Furthermore, in light of her early guilty plea pursuant to an information, she has clearly demonstrated acceptance of responsibility, entitling her to an additional three-level decrease. *Id.* at ¶¶ 43-44. As such, her Total Offense Level is 16.

2. *Criminal History*

The government agrees that the Defendant has no known criminal convictions and as such has a criminal history score of zero, resulting in the Defendant being in Criminal History Category ("CHC") I.

3. *USSG Range*

In CHC 1, with a Total Offense Level of 16, the defendant's Guidelines range is 21-27 months in Zone D. In Zone D, the minimum term may be satisfied only by incarceration. *See* USSG § 5C1.1(f).

C.   Recommendation

After calculating the applicable Guidelines range, the Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a), noted *supra* at III.A. Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007). The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The United States recommends that the Court sentence the defendant to a term of incarceration of

21 months, which, as detailed below, will best effectuate the purposes of sentencing as outlined in § 3553(a).

### 1. Nature and Circumstances of the Offense

The Defendant's conduct in this case was particularly brazen. She falsely represented to the SBA that she would use $1.5 million in public EIDL money designed to help small businesses stay afloat during a global pandemic for the benefit of her own small business, but, instead, quickly and methodically put those funds in service of the only goal she ever had: her own self-enrichment.

By brief way of background, the Defendant had previously received two separate tranches of EIDL funds in 2020 and earlier in 2021. She later applied for a third tranche, this time upping the requested amount to $1.5 million. She then frequently followed up on the status of her funds which, she insisted, were desperately needed for her business. *See* Figures 1 and 2 below.

| 10/15/2021 | [Angela.Leathers] | EIDL (RER) | Comments |
|---|---|---|---|
| CSC Mailbox received an Email from : jennifer@nextlevelpartners.net ------------------ Original Message ------------------ From: Jennifer May ; Received: Thu Oct 14 2021 22:31:22 GMT-0400 (Eastern Daylight Time) To: SBA DCS NEW ; ODA DSC ; DCS2 ; Customer Service ; DisasterCustomerService@sba.gov ; Cc: Jennifer May ; Subject: Application #: 3303070872 I requested an increase to $2m. I logged in and it used to say under review but now everything is gone. Can you help? ============================================= DRS provided requested information in Email response: STATUS INCREASE STILL PROCESSING ||||

| 11/09/2021 | [Linda.Hughes@sb] | EIDL (RER) | Comments |
|---|---|---|---|
| ------------------ Original Message ------------------ From: Jennifer May ; Received: Mon Nov 08 2021 13:39:05 GMT-0500 (Eastern Standard Time) To: SBA DCS NEW ; ODA DSC ; DCS2 ; Customer Service ; DisasterCustomerService@sba.gov ; Subject: SBA Loan No. 4340357903 - Approved Hi! Is there anything I need to do? I thought the loan would have been distributed by now. Please let me know. I need to make payroll. Thanks, Jennifer May ============================== DRS responded to CSC email file notated. Rolled up - funding failed. ||||

The funds were disbursed on November 24, 2021 and credited to the Bank of America account operated and maintained by the Defendant on behalf of NLP, ending in 1873. Yet almost immediately upon receiving these funds, though, the Defendant quickly whisked the money out of her business's account and into her personal account (ending 0742) or those pertaining to unrelated business ventures. From there, $855,000 was poured into accounts she maintained at online cryptocurrency exchanges either the same day she received the funds, November 24, 2021, or two

days later, November 26, 2021, after the Thanksgiving holiday. The below chart summarizes the activity in question.



Of particular note was the way in which the Defendant structured the transactions. While a substantial portion of the funds were routed directly to her personal account -0742 that very day, the Defendant also attempted to break up additional EIDL proceeds into tranches of $25,000, which she routed through four separate accounts, three of which (Solidarity HR, Upland Realty, and Mabel Properties), up until that point, had very little activity in them. After being funneled through the four accounts, the funds were then moved directly into her personal account, with no discernible, legitimate purpose for having been routed this way.

9

The Defendant then moved the money out of her personal bank account and into her accounts on BlockFi and Coinbase. From there, after a series of transactions, the Defendant ended up purchasing large quantities of a token named FTM on the blockchain Multichain Fantom Bridge, on November 26, 2021. These purchases were not based on a momentary whim as the Defendant had spent months discussing the prospects of this token with at least one other employee with NLP, as demonstrated in the exchanges screenshotted in Figure 3 below.



Nevertheless, ultimately her speculation failed and the Defendant ended up sustaining losses of almost $446,000 in total. Yet that did not deter her from taking what she had left after her failed cryptocurrency speculation and putting it into yet another business venture –the purchase of an existing business known as "The Lane at Ivy City," (hereinafter "The Lane") which operated

as a bar, café, and child care center, among other things, in the Ivy City neighborhood in Washington, D.C. In March 2022, she cashed out almost $300,000 from her BlockFi account alone (Figure 4) and put that into a separate bank account designed to finance her new venture (Figure 5), before the money ultimately went to an escrow account of the attorney the Defendant and her business partner used for the purchase (Figure 6).





Thereafter, once the business was up and running, she continued to use EIDL proceeds to make payments to vendors. The Lane was wholly and completely operationally unrelated to the Defendant's business at NLP and there was no overlap between the two. The Defendant made little attempt to hide what she was doing and where this money was coming from, as shown in a screenshot of an exchange with an associate captured in Figure 7 below.

Finally, in and around that same time, in February 2022, the defendant took what remained of the EIDL proceeds and purchased a commercial property in Middleburg, Virginia. The downpayment on the commercial property was funded in part by at least $81,000 in proceeds from her EIDL loan. This new commercial property was not for the purpose of setting up a satellite office for NLP – which by that point was operating largely remotely – nor did it have anything to do with NLP's business operations.

Throughout 2023, the SBA made various attempts to collect on the outstanding EIDL debt that the Defendant had incurred, but beyond a small payment of just under $10,000 in April 2023, the Defendant never made any effort toward actually repaying the loan. In November 2023, the SBA made one final effort at calling her and attempting to collect, but on that very phone call, she explained she did not have the means to repay, after which the agency wrote off the loan.



In essence, the Defendant made a long-term financial play which involved using public monies not for their designated purpose, but for her own, personal investments, perhaps believing that she would be successful in such ventures and able to repay the government with ease and retain whatever profit remained. When those plans came to naught, she simply declared she could not pay anymore and left the SBA, and by extension, taxpayers, footing the bill for her ill-conceived investments obtained through fraud. In the Defendant's scheme, the profits were to accrue only to her, while any losses suffered would be borne by everyone else but her.

Furthermore, while the government has not argued for the §2B1.1(b)(12) enhancement and does not believe it applies, the government very much does believe that this Court can take into account the overall context in which Defendant May's fraud occurred. The COVID-19 pandemic

13

represented a severe threat to the vitality of small businesses across the country. In response to this nearly unprecedented threat to the livelihood of such firms, the SBA declared the pandemic to be an emergency and allowed businesses to apply for up to $2 million in loans at low-interest rates when credit would otherwise not be available, while also allowing them generous repayment plans to ensure loan repayments did not subsequently bankrupt them. "SBA to Provide Disaster Assistance Loans for Small Businesses Impacted by Coronavirus (COVID-19)," March 16, 2020, *available at* https://www.sba.gov/article/2020/mar/16/sba-provide-disaster-assistance-loans-small-businesses-impacted-coronavirus-covid-19. The Defendant took advantage of the program's openness and generosity during a time in which so many businesses needed government support to survive and attempted to use those specially earmarked funds as "seed money" for a variety of other business ventures. Not only did her fraud divert resources that could have been better allocated toward businesses in actual need of government support, but it also undermined the integrity of the program as a whole.

    2.    *History and Characteristics*

The Defendant's history and characteristics do not readily reveal any reason why she would have been mentally or emotionally unable to avoid her criminal conduct in this instance, but rather suggest that she did what she did because she thought it would be profitable and could get away with it. While defendant's childhood and early adulthood were not without their challenges, she appeared to thrive as a young professional in this community. The Defendant received a bachelor's degree as well as a Master's in Business Administration, *see* PSR at ¶¶ 77-78. The Defendant then went on to build a successful small business from the ground up in Washington, D.C., employing up to 25 individuals at its height, *id.* at ¶ 82, with a reported sales amount of $792,000 as of 2025, *id.* at ¶ 84. In short, the Defendant was a successful, self-employed small businesswoman whose

company appeared to generate revenue and create jobs within the community. There was no compelling financial need for the Defendant to take $1.5 million in EIDL funds for her already successful business and immediately divert them for other purposes. Rather, the only logical conclusion that can be left to draw is that the Defendant saw an opportunity for even greater profits, with little risk (having offloaded that to the government), and seized it.

Balanced against these factors is the fact that the defendant has accepted responsibility for her misconduct. Indeed, she did so at essentially the earliest opportunity, having waived her right to be indicted and reached an agreement with the government before that ever became necessary. Moreover, the government would note, to the defendant's credit, that she debriefed with the government and during that time ultimately admitted to her own conduct. While the government is not making a motion pursuant to §5K1.1 based on those discussions, the defendant's actions upon being alerted to the government's investigation, from coming in and meeting with the investigation team to pleading at the earliest opportunity, do underscore her willingness to accept her punishment and move on with her life.

      3.    *Need for Sentence Imposed*

The government believes that its proposed sentence of 21 months' incarceration will best effectuate the purposes of sentencing as set forth in 3553(a)(2)(A)-(D), that is, for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence of criminal conduct; protect the public from further crimes of the defendant; and allow the defendant with training, treatment, and other type of care she may require. The government believes that its recommendation of a sentence at the bottom of the defendant's properly calculated Guideline range accomplishes all of these goals. The defendant's conduct in this case, as described above, is serious: she defrauded the government

into giving her $1.5 million in supposed disaster recovery funds for her small business with no intent to actually use those funds for their approved purposes at the time of her application. The Defendant then, essentially, gambled away hundreds of thousands dollars in those funds as she attempted to ride short-term spikes in the value of an obscure cryptocurrency token. After she sustained heavy losses on such speculation, the Defendant was not chastened into stopping her improper use of public funds but doubled down by pouring additional money into her other business ventures which bore absolutely no connection to the business for which she applied for the money. A non-carceral sentence of the type recommended by USPO fails to adequately capture the scale of her offense ($1.49 million in losses), the sheer brazenness of the scheme, including her casual admission to a colleague that she was repurposing the EIDL funds designated for NLP for a wholly separate business venture, and the context in which her fraud occurred. On the other hand, the government's recommendation of a 21-month carceral sentence underscores the seriousness of the offense and takes into account all of those factors.

As important is the Court's consideration of the possible deterrent effect that a sentence in this matter may have on others contemplating committing this type of fraudulent scheme. Section 3553(a) is not limited to the necessary sentence to deter the defendant from engaging in further criminal conduct (specific deterrence), but also includes consideration of deterring other potential criminals from engaging in similar conduct (general deterrence). *See, e.g., United States v. Phinazee*, 515 F.3d 511, 515-16 (6th Cir. 2008) ("The plain language of the statute . . . also militates against limiting the authority of the court to specific deterrence. . . . We note that this conclusion comports with the longstanding and uncontroversial practice of considering general deterrence in sentencing."). From the standpoint of general deterrence, a non-carceral sentence will have very little deterrent effect on others and would suggest that obtaining public funds under

false pretenses, immediately using them for your own benefit, and then leaving the government with the bill will merely result in a long period of mere supervision. Rather, the government's proposed sentence of 21 months of incarceration will send a strong message to all who seek to defraud that such acts will not be tolerated, and that rather than being supervised in the comfort of your own residence, would-be perpetrators will be removed from the community altogether.

4.     *Avoiding Unwanted Sentencing Disparities*

A sentence of 21 months' incarceration is well in-line with sentences in other cases within this District and others involving similar loss amounts and would not lead to unwarranted sentencing disparities. Such cases would include the following:

- *United States v. Zhong Chen* (24-cr-50 (CRC)):   18 month-sentence for misappropriation of portion of approximately $348,000 in EIDL proceeds to engage in day-trading[2]

- *United States v. Wendy Villatoro* (24-cr-446 (CJN)):  15 month-sentence for PPP fraud defendant (and public official) who made material misstatements on loan applications involving approximately $844,000.

- *United States v. Gholam Kowkabi (23-cr-193 (RBW)):* 57 month-sentence for fraud involving more than $ 1.6 million in COVID-19 relief funds as well as tax evasion involving $1.35 million in unpaid taxes

- *United States v. James Kyle Bell* (21-cr-284 (JDB)):   46-month sentence for defendant who pled to both wire fraud charges arising from a so-called scam PAC scheme as well as fraudulently applying for $1.6 million in PPP funds.

Furthermore, the JSIN itself reveals that for individuals sentenced with similar offense levels under §2B1.1  as well as criminal histories to that of the Defendant, the median sentence was 18 months and the average sentence was 19 months. *See* PSR at ¶ 140.

---

[2] As this Court is well aware, Defendant Chen had a different criminal history which included a prior conviction for a violent felony in D.C. Superior Court.

      5.     *Restitution and Forfeiture*

With respect to restitution, the crime of wire fraud is an "offense against property under" Title 18, and thus fall under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. As a result, the Court must order that "the defendant make restitution to the victim of the offense[s]." 18 U.S.C. § 3663A(a)(1). In this case, the Defendant, by virtue of her plea agreement, has agreed to pay back $1,490,147 to the SBA. The government will provide the relevant address / point of contact at the SBA to the Clerk's Office.

With respect to forfeiture, the Defendant has consented to the entry of a forfeiture money judgment in the amount of $1,490,147, in this case. The government will furnish a copy of a signed consent order to the Court for entry on the docket in advance of sentencing.

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, the government respectfully recommends that this Court sentence the Defendant to a term of 21 months' incarceration, followed by 36 months of supervised release.

                                                    Respectfully submitted,

                                                    JEANINE FERRIS PIRRO
                                                    UNITED STATES ATTORNEY

                                                    /s/
                                                    _____
                                                    WILL HART
                                                    Assistant United States Attorney
                                                    U.S. Attorney's Office for the
                                                    District of Columbia
                                                    D.C. Bar No. 1029325
                                                    601 D. St., N.W.,
                                                    Washington, D.C. 20530
                                                    William.hart@usdoj.gov
                                                    (202)-252-7877